**Robert Paul DREW and Linda J. Drew, Plaintiffs,**

v.

**CHRYSLER CREDIT CORPORATION, a corporation, Defendant.**

**Civ. A. No. 82–6094–CV–SJ.**

United States District Court, W.D. Missouri, St. Joseph Division.

Oct. 25, 1984.

On Motion to Vacate or Alter Judgment Nov. 28, 1984.

Jerold L. Drake, Stephens & Drake, Grant City, Mo., for plaintiffs.

Howard D. Lay, Griffin, Dysart, Taylor, Penner & Lay, Kansas City, Mo., for defendant.

## MEMORANDUM AND ORDER

SACHS, District Judge.

Pending before the court are a motion for summary judgment filed by defendant Chrysler Credit Corporation and a cross-motion for partial summary judgment (as to liability) filed by plaintiffs, Mr. and Mrs. Drew.

The following facts are relevant to these motions: On January 3, 1980 plaintiffs purchased and financed a 1975 Toyota automobile with Bethany Trust Company for a total of $2,508, payable $104.50 per month, commencing February 3, 1980. On February 21, 1980 plaintiffs agreed to purchase a new 1980 Plymouth Champ automobile from North Belt Chrysler-Plymouth, a new car dealer in St. Joseph, Missouri, and agreed to trade their 1975 Toyota under a written agreement. Shortly thereafter, North Belt accepted, and assigned to defendant, the Retail Installment Contract of Robert and Linda Drew on the 1980 Champ.

North Belt delivered its check No. 10466 to Bethany Trust for $2,143.75 to pay off the loan on the 1975 Toyota traded in by plaintiffs; Bethany Trust released its lien on the Missouri title and delivered the title, signed by plaintiffs, to North Belt. On February 26, 1980 Bethany Trust stamped the note of plaintiffs "Paid", returned the note, and refunded $259.75 unearned finance charge on the 1975 Toyota. On February 28, 1980 the North Belt check was returned as unpaid to Bethany Trust. The new car dealer was then in dire financial straits, and defendant sued North Belt on that day for replevin and other remedies. The dealership closed its doors.

Plaintiffs, at the request of Bethany Trust, thereafter executed a guaranty on March 4, 1980 for the $2,143.75 unpaid check of North Belt and subsequently signed a note and paid Bethany Trust. Peggy Rinehart, an officer of Bethany Trust has signed an affidavit to the effect that Bethany Trust did not intend to receive the North Belt check as payment and satisfaction of the debt owed to it by plaintiffs. When the check was returned as unpaid, Bethany Trust looked to plaintiffs to make payment on their promissory note, which had been marked "paid" on the mistaken assumption that the auto dealer's check was fully funded.

Correspondence ensued between plaintiffs' and defendant's counsel. Plaintiffs sought to set off the $2,143.75 against the debt to Chrysler Credit. Defendant denied the setoff and demanded full monthly payments. Upon advice of counsel, plaintiffs paid and defendant received thirty monthly payments of $128.18. On September 3, 1982 plaintiffs tendered a check for $35.31 to defendant as full and final payment. Under plaintiffs' calculations, these payments plus the setoff amount would satisfy their debt to defendant. Defendant did not accept the check as tendered.

On November 1, 1982 defendant mailed to plaintiffs, and their attorney, a notice of intent to repossess. On November 20, 1982 defendant did repossess the 1980 Champ from plaintiffs' closed, but unlocked garage without knowledge of plaintiffs. On November 22, 1982 plaintiffs obtained the return of certain contents of the 1980 Champ.

Plaintiffs instituted the present suit in the Circuit Court of Harrison County, Missouri on November 22, 1982. The case was removed to this court by defendant. Defendant mailed a notice of the sale after repossession to plaintiffs and their attorney on November 23, 1982. Neither plaintiffs nor anyone on their behalf offered to redeem or pay anything further on the 1980 Champ. Defendant's counsel wrote to plaintiffs' counsel on December 29, 1982

and March 1, 1983 to invite bids on the car. None were forthcoming.

The principal issues presently before this court are (1) whether the retail installment contract purchased by defendant from North Belt was taken subject to all claims and defenses that plaintiffs would have had against North Belt; (2) if so, whether defendant converted plaintiffs' property when it repossessed the 1980 Champ. The court answers both of these questions in the affirmative.

When defendant purchased the retail installment contract from North Belt, it was purportedly taken subject to all claims and defenses that plaintiffs would have had against North Belt. The contract was stamped with the language specified by 16 C.F.R. § 433.2 (1984):

NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

Moreover, § 408.405, RSMo, provides that [t]he rights of a holder or assignee of an instrument, account, contract, right, chattel paper or other writing other than a check or draft, which evidences the obligation of a natural person as buyer, lessee, or borrower *in connection with the purchase or lease of consumer goods* or services, *are subject to all defenses and setoffs of the debtor* arising from or out of such sale or lease, notwithstanding any agreement to the contrary, only as to amounts then owing and as a matter of defense to or setoff against a claim by the holder or assignee; provided, however, with respect to goods only, the rights of the debtor under this section may be asserted to the seller at the address at which he did business at the time of the sale and must be so

asserted within ninety days after receipt of the goods.

(emphasis added).[1]

Defendant claims that the statute does not apply because the car was not a consumer good within the meaning of the statute in that it was used partially or predominantly for business purposes. Plaintiff Robert Drew is a speech therapist and works in a number of northwest Missouri and Iowa schools, nursing homes, etc. He used the Champ in approximately the following manner: 15% personal; 60% commuting to and from his residence; and 25% between places of business. *See* Affidavit of Robert Drew (signed Oct. 13, 1984).

Defendant further contends that (1) the controversy did not arise out of the sales transaction, (2) the separate agreement regarding the trade-in violates the parol evidence rule, (3) plaintiffs are seeking greater recovery than a setoff against a claim, and (4) plaintiffs are barred because they failed to give the statutory notice to the seller.

■ Plaintiff Robert Drew did attempt to complain to North Belt, but found its doors closed. He then asserted to defendant a right of set off. This should suffice. *See Recent Developments: Commercial Transactions—Consumer Protection—Preservation of Consumer Defenses Under the New Missouri Legislation,* 19 St. Louis U.L.J. 395, 408 (1975) [hereinafter cited as *"Recent Developments"*].

■ In an effort to effectuate legislative intent the court is authorized to "make sense out of a statute". *Bank of Belton v. State Banking Bd.,* 554 S.W.2d 451, 456 (Mo.App.1977).[2] Where a seller has gone out of business (or in some cases may have died) the buyer should not be deemed to have failed to "assert" his claim "to the seller" within the requisite 90 days when a physical attempt to notify and complain has been made, and actual notice is given to the assignee. Just as *Taylor v. United Missouri Bank of Kansas City,* 693 F.2d 63 (8th Cir.1982), probably turned on whether the assignee had acted reasonably in attempting to contact the debtor, this case should not impose an impossible or unreasonable burden on the buyer. A statute should be construed to avoid imposing impossible, impractical, and futile conduct. *See Moran v. Superior Court,* 35 Cal.3d 229, 197 Cal.Rptr. 546, 673 P.2d 216 (1983); *Tribune Publishing Co. v. Curators of University of Missouri,* 661 S.W.2d 575, 583 (Mo.App.1983).

■ The court must therefore determine whether it is dealing with "consumer goods" either under the pertinent Missouri statute for consumer protection in credit transactions, § 408.400 *et seq.,* RSMo, or under the protective regulation of the Federal Trade Commission, 16 C.F.R. § 433.-1(b) (1984).

The FTC regulation in question relies on the coverage of the Truth in Lending Act (hereinafter "TILA"), enacted in 1968. The TILA definition of consumer products is nearly identical with that of the Missouri statute. The Missouri statute defines "consumer goods" as goods "for use primarily for personal, family or household purposes." § 408.400.1(2), RSMo. The TILA definition of a "consumer" is one who buys property that is "primarily for personal, family, or household purposes." 15 U.S.C. § 1602(h).

There is distinct ambiguity in these definitions. Unlike the Uniform Commercial Code, which expressly looks to the buyer's intent or usage, TILA and the Missouri statute do not necessarily focus on whether the goods "are *used or bought for use* primarily for personal, family or household

---

1. Defendant asserts that the Motor Vehicle Time Sales Law, Chapter 365, RSMo governs the transactions. Defendant, however, cites no case law indicating that the more recent consumer protection statutes of Chapter 408, RSMo have been limited by implication. The court finds this contention to be without merit.

2. See similar doctrines of statutory construction in federal cases initially stated by Judge Learned Hand and still in use. *District 2 Marine Engineer Beneficial Ass'n v. Grand Bassa Tankers, Inc.,* 663 F.2d 392, 395 (2d Cir.1981).

purposes." § 400.9–109(1). The provisions here in issue may reasonably be construed to deal with categories of goods, regardless of the intent of usage of a particular buyer.

The Magnuson-Moss Warranty Act (enacted still later) avoids ambiguity and expressly changes the focus of attention by defining a "consumer product" as one "which is normally used for personal, family or household purposes". 15 U.S.C. § 2301(1). Automobiles used mainly for business purposes and owned by a corporation have been treated as consumer products under that legislation. *Business Modeling Techniques, Inc. v. General Motors Corp.*, 123 Misc.2d 605, 474 N.Y.S.2d 258 (S.Ct. Monroe County, 1984).[3] Presumably the same is true in consumer safety legislation, as it would make little sense to distinguish between personal and business-owned automobiles.

In the TILA context, the case law shows some ingenuity in finding a consumer credit transaction, in order to carry out presumed legislative intent. *See, e.g., Tower v. Moss*, 625 F.2d 1161, 1166 n. 4 (5th Cir.1980) (financing of repairs to low rental residential property which a non-resident owner intended to use as a retirement home was a consumer credit transaction). There is little reason to classify the purchase of automobiles, a form of property generally put to personal use, at least when purchased by individuals, as anything

other than a consumer transaction, even though a particular buyer may use the car most of the time in pursuit of business or professional activities. The automobile dealer in this case used the consumer credit form.

Although the ambiguity is not easy to resolve, I believe the Magnuson-Moss focus on normal usage of the product should be applied in construing § 408.400, RSMo, if not TILA,[4] rather than the UCC focus on the buyer's individual purposes or usages.

Even if the focus were to remain on the buyer's particular usage or intent, as required by the UCC,[5] travel from an owner's residence to a place of business has been judicially treated as personal rather than business usage. *Malicoat v. Volunteer Finance & Loan Corp.*, 57 Tenn.App. 106, 415 S.W.2d 347 (1966); *In re Barnes*, 11 U.C.C. Rep.Serv. (Callaghan) 670 (Bkrtcy.Maine, 1972); *Redhouse v. Quality Ford Sales, Inc.*, 511 F.2d 230, 240 (10th Cir.) (Doyle J., dissenting), *modified*, 523 F.2d 1 (10th Cir. en banc 1975). As I believe Judge Doyle implied in the *Redhouse* case, which involved use of a pickup truck by a presumably itinerant carpenter, commuting from a residence to multiple places of business or professional activity may also be considered a personal rather than a business activity.[6] It serves the legislative purpose, in my judgment, to classify an automobile

---

3. The court is aware that there is at least one ruling under Magnuson-Moss that would classify products according to their normal usage by the particular buyer. *Balser v. Cessna Aircraft Co.*, 512 F.Supp. 1217 (N.D.Ga.1981). This seems contrary to the wording used by Congress, particularly when one notes the changes in phrasing from the Uniform Commercial Code. In *Balser* it was doubtless tempting to classify according to the buyer's normal usage, otherwise there would have been a more difficult task of characterizing the normal usage of small aircraft in general. It would seem that the underlying purpose of Congress in enacting Magnuson-Moss would be served by looking to the normal usage by the public or by the particular buyer, and classifying as a consumer product anything that qualifies under either test. Whether this would depart excessively from the language of the Act need not be decided in this case.

4. The ambiguity in 15 U.S.C. § 1602(h) is probably resolved in the next section, § 1603(*l*), which does refer to the borrower's purposes.

5. Section 408.400.2 incorporates the definitions in Articles 1, 3, and 9 of the UCC. The classification of goods as consumer goods in § 400.9–109(1), however, is not within the definitional sections of Article 9, §§ 400.9–105, 400.9–106, and 400.9–107. Thus, any stricter definition of consumer goods in the UCC is not dispositive as to § 408.405. *Cf. Recent Developments, supra*, at 404 n. 34.

6. Differences in income tax treatment may be disregarded. Simply because Congress may allow a "business expense" deduction, as it may on child care, for example, would not control interpretation in another context.

as a consumer product, and its purchase on credit as a consumer credit transaction, even though predominantly commuter use may have been anticipated.

The legislative purpose in enacting the Consumer Obligations Act of 1974, § 408.-405, RSMo, is not difficult to understand. The General Assembly sought to preserve for purchasers of consumer goods all rights against a finance company or other assignee that the purchaser would have against the seller "arising from or out of such sale". *See United Finance Plan, Inc. v. Parkview Drugs, Inc.*, 250 S.W.2d 181 (Mo.App.1952). The legislation expressly protects consumers against form contracts and other agreements purporting to give an assignee greater rights than the seller would have had. *See generally Recent Developments, supra* at 396, 399–401. An individual's purchase of an automobile for normal purposes, such as purely personal and commuter-type use, seems clearly within the scope of the statute. Application to a finance company having at least nominal affiliation with the seller seems to carry out the intent of preventing consumer losses resulting from "paper shuffling." Defenses relating to a seller's misconduct or an aborted agreement regarding a trade-in seem fairly to arise "from or out of" the new car sale. While the finance company may consider it unfair to visit upon it the sins of the auto dealer, that comports with the legislative intent. *Cf. Whitlock v. Midwest Acceptance Corp.*, 575 F.2d 652, 654 (8th Cir.1978) (construing the Truth In Lending Act, 15 U.S.C. § 1601 *et seq.*, and Federal Reserve Regulation Z, 12 C.F.R. § 226.1 *et seq.*).

The statute in question has not been construed by the Missouri appellate courts. It is remedial legislation, and will doubtless be " 'liberally construed, in favor of' " the consuming public, and to prevent " 'the evil

which it was designed to remedy ...' ". *State ex rel. LeFevre v. Stubbs*, 642 S.W.2d 103, 106 (Mo.1982) (quoting Crawford, Construction of Statutes § 346 (1940) and *State ex rel. Brown v. Board of Education of City of St. Louis*, 294 Mo. 106, 114–15, 242 S.W. 85, 87 (1922) (en banc)).

The Drew's automobile was a consumer product within the meaning of § 408.405, RSMo. Defendant took its paper subject to plaintiffs' claims against the automobile dealer.[7]

 Defendant next contends that plaintiffs did not owe Bethany Trust $2,143.75 because when the check of North Belt was delivered to Bethany Trust, Bethany Trust released its lien on the Missouri title and stamped the note of plaintiffs "Paid", returned the note and refunded the unearned finance charge. Plaintiffs counter that Bethany Trust did not intend to accept the check of North Belt as payment and satisfaction of the debt owed by plaintiffs. As the court previously noted, Peggy Rinehart, an officer of Bethany Trust, signed an affidavit that the bank did not intend to accept the check as payment in satisfaction. In *Hall v. Knapp*, 552 S.W.2d 299, 303 (Mo.App.1977), the Missouri Court of Appeals stated that where a check is accepted as the "means" through which payment may be obtained and not as payment itself, the claim or debt is not extinguished by mere acceptance of the check. *See also Brent v. Westerman*, 123 F.Supp. 835, 837 (W.D.Mo.1954). Where there is no agreement that the check itself shall constitute payment, a "satisfaction" does not occur until payment of the check has actually been received. Based upon the affidavits, the court must conclude that the parties did not intend the check itself to constitute payment.[8] Thus, no satisfaction

---

**7.** Defendant's claim that the agreement by North Belt to pay off the Bethany Trust loan on the 1975 Toyota is barred by the parol evidence rule is without merit. Not only was § 408.405, RSMo designed to modify the holder in due course rule, *see Recent Developments, supra* at 396, but the parol evidence rule contains exceptions for collateral agreements. *See* § 400.2-

202(b), RSMo; *McDown v. Wilson*, 426 S.W.2d 112, 117 (Mo.App.1968); *Brown v. Oliver*, 123 Kan. 711, 256 P. 1008 (1927).

**8.** Unlike the situation in *Jacobson v. Federal Deposit Ins. Corp.*, 407 F.Supp. 821, 827 (S.D. Iowa 1976), plaintiffs understood the circumstances whereby North Belt paid off their note.

occurred. When the check of North Belt did not clear, Bethany Trust properly looked to plaintiffs to make good on the note.

■ Once the court has decided that plaintiffs should have been allowed the setoff against defendant's claims for payment (thereby placing defendant in violation of § 408.405), the court must then decide whether a cause of action has been created because of defendant's seizure of the car following its wrongful refusal to allow the setoff.

The Missouri Court of Appeals held in *Jones v. First Union Bancorporation*, 646 S.W.2d 412, 414 (Mo.App., W.D.1983), that "[i]n order for plaintiff[s] to have a right of action for conversion, it is incumbent upon [them] to show that [defendant] had no right to repossess the automobile." If plaintiffs were indeed entitled to the setoff, defendant did not have a right to repossess the car. The same is true with respect to plaintiffs' charge of trespass. In *Baker v. Newcomb*, 621 S.W.2d 535, 537 (Mo.App., S.D.1981) (en banc), the Missouri Court of Appeals held that

> [a] party is liable in trespass even though acting under a mistaken belief of law or fact, however reasonable .... A party may be liable in trespass if he intends to do the act which results in the damage, although in so doing he did not intend to commit an act of trespass; may not even know that his act will constitute a trespass, and may act in good faith and through honest mistake.

(citations omitted). Moreover, since plaintiffs had been making all reasonable efforts to work out their disputes with defendant, defendant can make no argument that § 408.405 does not apply in this case. *See Taylor v. United Missouri Bank of Kansas City*, 693 F.2d 63, 65 n. 6 (8th Cir.1982).

The court finds the rest of the defendant's contentions to be without merit in this action. Accordingly, it is hereby

ORDERED that defendant's motion for summary judgment is DENIED. It is further

ORDERED that plaintiffs' motion for partial summary judgment is GRANTED. All that remains to be tried in this case is the issue of damages. A trial notice will be forthcoming.

## ON MOTION TO VACATE OR ALTER JUDGMENT

Pending before the court is defendant's motion to "vacate, alter, and amend the judgment entered on October 26, 1984 and to order interlocutory appeal" to the Eighth Circuit. Defendant requests oral argument and the court granted the request.

Defendant first argues that the reference to "goods" in § 408.405, RSMo, enacted in 1974, does not include motor vehicles, because motor vehicles are expressly excluded from the definition of "goods" in § 408.250(4), RSMo, enacted some years earlier. The definitions contained in § 408.250, apply, however, only to §§ 408.-250 to 408.370, RSMo. The pertinent section is thus not governed by these definitions. There can be no question but that motor vehicles are generally classifiable as "goods." [1] It is quite consistent with legislative intent for the General Assembly to supplement the provisions of chapter 365 with more general consumer protection in later statutes. The applicability of the statute in question was assumed in *Taylor v. United Missouri Bank of Kansas City*, 693 F.2d 63 (8th Cir.1982).

Defendant next asserts that the court's "most fundamental error" in its ruling was in failing to note an alleged mathematical error in plaintiffs' final payment. If the calculations were incorrect by one payment of $128.18 this would not be dispositive.

---

**1.** As noted in the earlier ruling, the pertinent language differs from but may be compared with the language of the Uniform Commercial Code. Under the U.C.C. the term "goods", ap-pearing in § 400.2–105, RSMo, includes automobiles. *Rose v. Epley Motor Sales*, 288 N.C. 53, 215 S.E.2d 573, 577 (1975).

Defendant had never narrowed the controversy or indicated that it would have been satisfied with the extra $128.18 payment. On the contrary, defendant's "notice of intention to repossess" demands *two* such payments, plus "late charges", or $266.36. Def.Dep.Exh. 20, attached to Def. Motion for Summary Judgment filed Feb. 13, 1984, Doc. 34. Defendant premised its repossession on an assertion of "Total amount now due" that was excessive on any calculation, if the setoff is sound. It seems irrelevant that plaintiffs may have made a minor miscalculation.

Defendant may, however, ultimately be entitled to the $128.18 as a setoff at trial to any award of damages to plaintiffs.[2]

■ Defendant continues to argue that plaintiffs are going beyond their statutory remedies in seeking more than a "defense" or "setoff against a claim by the holder or assignee." § 408.405, RSMo. But plaintiffs did initially assert their setoff rights defensively. When defendant violated their statutory rights and then engaged in a wrongful repossession, the repossession damages arise from a second violation of law and are not subject to the statutory limitation.[3]

Defendant further contends that plaintiffs' bank caused the financial loss by releasing its secured title to the Toyota, and that such release evidences an intent to accept as final payment the North Belt Chrysler check that was later dishonored. The issue of the bank's possible liability to defendant is not in this case and it would be inappropriate to anticipate what issues might be raised in prospective litigation.

On the question of intent, any release of title is similar in nature to the return of the note to plaintiffs, which has been discussed. Merely because the bank processed papers too rapidly has little bearing on the intention of the bank officials. The affidavit on that subject has not been rebutted. There is no evidence that it was the bank's practice or intent to accept "bad" checks as final payment.

■ The bank's obtaining payment from plaintiffs counterbalances any inference from conduct that the bank intended to take the check as final payment. While there are unusual situations in which this occurs, "the general rule" is that "acceptance of a note, bill or check does not constitute payment of an underlying debt." *Hall v. Knapp*, 552 S.W.2d 299, 304 (Mo.App. 1977). Defendant has not presented a sufficient showing in response to plaintiffs' motion to create a jury issue on this subject. *Matter of Citizens Loan & Savings Company*, 621 F.2d 911, 913 (8th Cir.1980); *National Union Fire Ins. Co. v. Argonaut Ins. Co.*, 701 F.2d 95, 97 (9th Cir.1983). Defendant will not be relieved from the effect of the October 26 ruling.

The court will also deny defendant's request for approval of an interlocutory appeal pursuant to 28 U.S.C. § 1292. The Eighth Circuit has repeatedly expressed its disfavor for such interlocutory appeals. This court does not find that an interlocutory appeal would serve the interests of justice. The case should proceed to trial for determination of damages. If defendant chooses to appeal, then the whole matter may be raised before the Eighth Circuit at that time. Accordingly, it is hereby

ORDERED that defendant's motion to vacate, alter and amend the judgment entered on October 26, 1984, or to order interlocutory appeal to the Eighth Circuit of that Order, is DENIED.

---

2. The court notes that defendant also may have miscalculated the amount owed, in its Notice of Intent to Repossess, wherein defendant states the net contract balance as $2,193.82. Attachment to Doc. 34. The $2,143.75 setoff for plaintiffs' payment to bank on account of the bad check of North Belt Chrysler plus another $20.00 check to North Belt Chrysler plus the $35.31 check tendered to defendant as full and final payment would total $2,199.06. This would amount to $5.24 more than plaintiffs owed defendant.

3. Insofar as defendant denies it made a "claim" on plaintiffs which triggered the right of setoff, the court is satisfied that the "notice of intent to repossess" constitutes a demand sufficient to satisfy the judges in *Taylor v. United Missouri Bank, supra.*